UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------- X
                                   :
THADDEUS GABARA,                   :
                                   :
                       Plaintiff, :        19cv9890(DLC)
                                   :
           -v-                     :        OPINION AND ORDER
                                   :
FACEBOOK, INC.,                    :
                                   :
                       Defendant. :
                                   :
---------------------------------- X

APPEARANCES

For plaintiff:
Thaddeus Gabara
P.O. Box 512
New Providence, NJ 07974

For the defendant:
Calvin E. Wingfield Jr.
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018

DENISE COTE, District Judge:

    Defendant Facebook, Inc. ("Facebook") has moved to dismiss
this patent infringement action on the ground that the patents
at issue claim patent-ineligible subject matter.  See 35 U.S.C.
§ 101 ("Section 101").  For the reasons that follow, the
defendant's motion to dismiss is granted.

**Background**

The following facts are drawn from the Second Amended
Complaint ("SAC") and documents integral to that pleading.
Thaddeus Gabara ("Gabara") alleges that Facebook is committing
direct, induced, and contributory infringement of five U.S.
patents:  Nos. 8,930,131 (the "'131 Patent"); 8,620,545 (the
"'545 Patent"); 8,836,698 (the "'698 Patent"); 8,706,400 (the
"'400 Patent"); and 9,299,348 (the "'348 Patent").  The SAC
alleges infringement by three Facebook products: Facebook 360,
3D Photos, and Workplace by Facebook.

The Image Patents

Four of Gabara's five patents concern the same subject
matter and contain substantially similar specifications.  The
'698 Patent was filed on December 26, 2011.  The '698 Patent is
related to Patent No. 8,532,919 (the "'919 Patent"), also filed
on December 26, 2011.  The '545, '400, and '131 Patents -- filed
on August 14, 2013; December 5, 2013; and April 21, 2014,
respectively -- all claim priority to the '919 Patent.  The
'545, '400, '131, and '698 Patents will be referred to as the
Image Patents.

The Image Patents work with a "portable unit," such as a
smart phone, that can display portions of a background image
that is larger than the unit's viewing screen.  The user of the

2

unit moves the device to bring other portions of the background image into view.  With this invention, the unit acts like a "Sliding Window" to provide views of the off-screen background image by moving the unit itself.  The prior art technology, by contrast, requires the user to scroll on the portable unit in order to view an off-screen portion of the background image.

For example, consider a background image of a map displaying two cities: City A on the screen of the unit and City B out of view.  If the user wished to move the view displayed on the device to City B, the prior art technology required the user to move the stationary background image by scrolling with her fingers.  The Image Patents allow a user to view City B on the map by moving the portable unit itself.  As alleged in the SAC, a significant benefit of the Image Patents is that they "take advantage of existing hardware that is commonplace in mobile devices, such as accelerometers and gyroscopes," allowing the Image Patents to be deployed across a wide range of devices.

The '400 Patent is entitled "Method and apparatus of physically moving a portable unit to view an image of a stationary map."  It issued on April 22, 2014, and is representative of each of the four Image Patents.

The Abstract of the '400 Patent explains the invention as follows:

3

A background map remains stationary while a portable
unit moves within a plane parallel to the screen of
the portable unit.  As the user moves the unit, images
of the background map appear on the screen of the
portable device.  The user scans the stationary map
presented on the screen of the portable unit.  This
has several benefits since now relative distances and
angular displacements within the plane between objects
that are outside of the range of the screen of the
handheld unit can be immediately be [sic] located and
placed into view on the screen of a portable unit.
The handheld unit is like a Sliding Window which
provides a view of this image of a stationary map
lying in the background of the portable unit.

Figure 10a in the specification of the '400 Patent shows

the prior art, in which the user had to move the background

image itself.  Figure 10b illustrates how the Image Patents

operate by permitting the user to navigate across the background

image by moving the device.  Those illustrations are reproduced

below:



**Sliding Map Movement**

1) Device Remains Stationary

2) Movement of Map in Increments Prevents Intuitive Grasp of Map Dimensions

3) Lacks Intuitive Distance and Angle

## FIG. 10a

**Innovative Device Movement**

1) Map Remains Stationary

2) Movement of Device Directly Correlates With Map Dimensions

3) Provides Intuitive Distance and Angle

## FIG. 10b

The '400 Patent contains twenty-one claims: three independent claims and eighteen dependent claims.  Claim 1 of the '400 Patent recites:[1]

> 1. A method of moving a portable unit to search for a new location comprising the steps of:
>
> displaying an image on a screen of the portable unit matched and superimposed to a corresponding portion of a background image of a stationary map;
>
> mapping a first point of the display image located in a center of the screen of the portable unit to a corresponding reference point in the background image of the stationary map;
>
> moving the portable unit to display a new portion of the background image of the stationary map on the screen;

---

[1] For the purposes of the § 101 analysis, Claim 1 of the '400 Patent is representative of all the claims in the Image Patents.

identifying a new location in the new portion of the background image;

determining a first vector between the center of the screen of the portable unit and the new location; and

moving the center of the screen of the portable unit to the new location as determined by the first vector.

The fifth patent on which Gabara brings suit is the '348 Patent.  The '348 Patent, issued on March 29, 2016, is entitled, "Method and apparatus for obtaining information from the web." It is a continuation of an application filed on January 26, 2011.  The invention operates on a "portable wireless system" to "improve the operations of a group" communicating electronically.  As Gabara asserts in the SAC, the invention embodied in Claim 7 of the '348 Patent "extract[s] key information from the ongoing conversation and generat[es] additional topics to continue" the conversation.  The invention "utilizes voice recognition, speech to text, and other blocks emulating various Finite State Machines (FSM)" to interact with the participants' conversation and provide new topics for discussion.

The '348 Patent contains three independent claims and sixteen dependent claims.  The SAC identifies Claim 7 of the '348 Patent as "exemplary" and describes only that claim.  In full, Claim 7 recites:

7. An intelligent conversation system augmenting, a
conversation between two or more individuals comprising:

a determination circuit configured to segregate the
conversation into topics and to extract search parameters
from the topics, wherein the search parameters are sent to
a search engine and search results corresponding to the
search parameters are received from the search engine;

a memory configured to store the search results; and

a finite state machine configured to sequence through the
search results to generate recall topics.

The '348 Patent does not describe how it improves upon the

prior art.  The SAC asserts that the invention in the '348

Patent "actively and dynamically contribute[s] to a

conversation," and that this is an improvement over existing

technology that will only search for new topics when called upon

to do so.

Procedural History

Gabara filed this action on October 25, 2019, claiming

infringement of the '131 Patent. In November, Gabara filed a

first amended complaint asserting infringement of four

additional patents.  Gabara is listed as an inventor of each of

the five patents.[2]

In response to Facebook's motion to dismiss the amended

complaint, Gabara filed the SAC on February 14, 2020.  The SAC

_____

[2] Gabara is a licensed patent agent and is named on over 125
patents.

describes one claim from each of the patents.  Facebook filed
the instant motion to dismiss the SAC on March 6, 2020.  It
became fully submitted on April 10.

## Discussion

Facebook asserts that the five patents on which the
plaintiff brings suit claim inventions ineligible for protection
under § 101.  "Whether a claim is drawn to patent-eligible
subject matter under § 101 is a threshold inquiry, and any claim
of an application failing the requirements of § 101 must be
rejected even if it meets all of the other legal requirements of
patentability."  In re Bilski, 545 F.3d 943, 950 (Fed. Cir.
2008) (citation omitted).

A patent is presumed to be valid.  35 U.S.C. § 282.  The
party challenging the validity of a patent bears the burden of
proving invalidity by clear and convincing evidence.  See, e.g.,
Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348, 1359 (Fed. Cir.
2007).  Patent eligibility under § 101, however, is "an issue of
law."  Packet Intelligence LLC v. NetScout Sys., Inc., 965 F.3d
1299, 1307 (Fed. Cir. 2020) (citation omitted).

Pursuant to § 101, an inventor can patent "any new and
useful process, machine, manufacture, or composition of matter,
or any new and useful improvement thereof."  35 U.S.C. § 101.
Abstract ideas as well as the laws of nature and natural

phenomena, however, are not patentable under § 101.  Alice Corp.
Pty. v. CLS Bank Int'l, 573 U.S. 208, 216 (2014) ("Alice").

    In Alice, the Supreme Court set forth a two-step framework
for distinguishing patents that claim abstract concepts "from
those that claim patent-eligible applications of those
concepts."  Id. at 217.  First, a court must "determine whether
the claims at issue are directed to a patent-ineligible
concept."  Id. at 218.  If the claims are directed to an
ineligible concept, a court proceeds to the second step and must
look for an "inventive concept," -- "i.e., an element or
combination of elements that is sufficient to ensure that the
patent in practice amounts to significantly more than a patent
upon the ineligible concept itself."  Id. at 217-18 (citation
omitted).

    "At Alice Step one," the inquiry is trained on "the claimed
advance over the prior art" and whether that claimed advance
embodies a patent-ineligible concept.  Trading Techs. Int'l,
Inc. v. IBG LLC, 921 F.3d 1378, 1384 (Fed. Cir. 2019) (citation
omitted).  Where the patent involves computer software, Alice
step one requires a court to "articulate with specificity what
the claims are directed to, and ask whether the claims are
directed to an improvement to computer functionality versus
being directed to an abstract idea."  Visual Memory LLC v.

NVIDIA Corp., 867 F.3d 1253, 1258 (Fed. Cir. 2017) (citation
omitted).

The "mere automation of manual processes using generic
computers . . . does not constitute a patentable improvement in
computer technology." Trading Techs. Int'l, 921 F.3d at 1384
(citation omitted).  And, "claims are not saved from abstraction
merely because they recite components more specific than a
generic computer." BSG Tech LLC v. Buyseasons, Inc., 899 F.3d
1281, 1286 (Fed. Cir. 2018).  Instead, an asserted improvement
in computer functionality must have "the specificity required to
transform a claim from one claiming only a result to one
claiming a way of achieving it." Ancora Techs., Inc. v. HTC
Am., Inc., 908 F.3d 1343, 1349 (Fed. Cir. 2018), as amended
(Nov. 20, 2018) (citation omitted).

The collection and analysis of information may also amount
to no more than the statement of an abstract idea.  The Federal
Circuit has "treated analyzing information by steps people go
through in their minds, or by mathematical algorithms, without
more, as essentially mental processes within the abstract-idea
category." Elec. Power Grp., LLC v. Alstom S.A., 830 F.3d 1350,
1354 (Fed. Cir. 2016) (collecting cases).  On the other hand,
"claims [that] are directed to a particular manner of
summarizing and presenting information in electronic devices"

may be eligible for patent protection.  Core Wireless Licensing
S.A.R.L. v. LG Elecs., Inc., 880 F.3d 1356, 1362 (Fed. Cir.
2018).

At Alice step two, a court must determine whether the
claimed invention, even if directed towards an abstract idea,
embodies an inventive concept.  In looking for an inventive
concept, a court must consider the elements of the claims "both
individually and as an ordered combination" to determine whether
the additional elements have transformed the claim into a
patent-eligible application.  Bascom Glob. Internet Servs., Inc.
v. AT&T Mobility LLC, 827 F.3d 1341, 1347 (Fed. Cir. 2016)
(citation omitted) ("Bascom").  "A claim contains an inventive
concept if it includes additional features that are more than
well-understood, routine, conventional activities."  Smart
Systems Innovations, LLC v. Chicago Transit Auth., 873 F.3d
1364, 1374 (Fed. Cir. 2017) (citation omitted).  "If a claim's
only 'inventive concept' is the application of an abstract idea
using conventional and well-understood techniques, the claim has
not been transformed into a patent-eligible application of an
abstract idea."  BSG Tech LLC, 899 F.3d at 1290-91.  Again, the
realization of an abstract idea on a generic computer does not
itself constitute an inventive concept.  See Mortgage Grader,

Inc. v. First Choice Loan Servs. Inc., 811 F.3d 1314, 1322 (Fed. Cir. 2016).

I.   The Image Patents

The invention presented in the Image Patents is to move the portable device itself to view different portions of images displayed on portable devices.  Moving the device to change one's view of the image instead of scrolling on the device to change the view is an abstract idea.  As each of the Image Patents explain, the invention is akin to moving a sliding window across an image.  Other pertinent analogies are the physical acts of moving a telescope across the night sky or a magnifying glass across a map.  Indeed, simply swiveling one's head to look at a different portion of the landscape or of a room or of a newspaper page are comparable commonplace activities.  In each instance, the object remains still and the observer moves her eyes or her device to focus on a different portion of the object.

Nor is the abstract nature of the invention saved by a description of an improvement the invention makes to the functionality of the mobile device.  The technical details set forth in the Image Patents are few.  Those that are mentioned, however, lack the specificity to nudge the patents into the realm of patentable subject matter.

12

For example, insofar as the '400 Patent explains how the
invention is realized, it recites a combination of conventional
components of mobile devices and well-known algorithmic steps.
Claim 1 of the '400 Patent does not set forth any technical
details.  The process of moving the viewing window is described
in terms of the results displayed: "displaying an image,"
"mapping a first point," "moving the portable unit,"
"identifying a new location," "determining a first vector
between the center of the screen of the portable unit and the
new location," and "moving the center of the screen."  Nothing
in that claim discloses how those steps are accomplished.

Even the more granular descriptions found in the
specifications of the Image Patents are vague.  Take the section
of the specification entitled "Detailed Description of the
Invention" in the '400 Patent.  In describing the process at the
heart of the Image Patents -- translating portable device
movement to a new view of the background image -- the
specification states that an "inertial guidance system" gathers
"information from the accelerometer and gyroscope sensors," and
sends that information to a "microprocessor."  Then, "[t]he
microprocessor calculates (based on the acceleration,
orientation scale of the map, and origin position) the new
position of the map that should be displayed in the center of

the screen."  That description offers little more detail than what is set forth in Claim 1.  What additional information it does provide is not specific enough to identify a patent-eligible innovation.  Inertial guidance systems, such as accelerometers, gyroscope sensors and microprocessors, are conventional computer components that the '400 Patent uses in their ordinary manner -- tracking the movement of the portable device.  Similarly, the formulas used to calculate a vector are commonplace.

Nor does the discussion of prior art in the specifications of the Image Patents suggest that the invention is not an abstract idea.  The Image Patents purport to solve a problem that arises whenever the screen on a portable device cannot display the entirety of an image.  The '400 Patent explains that, when using the prior art method of moving the background image, a user must scroll on "the screen to get a bearing of where this particular item of interest is with respect to the initial requested destination" and then magnify the image to view the second point.  Minimizing and magnifying the background image in this way causes the user to "lose bearing" and obscures the distance between the two points of interest in the background image.  This description of the limitation in the

prior art does not mean that the Image Patents themselves contain patentable subject matter.

First, the purported problem with the prior art is not a problem that arises only in the portable devices for which the inventions are intended.  The Image Patents do not "meet a challenge unique to computer networks" or present "a technological solution to a technological problem".  Packet Intelligence LLC, 965 F.3d at 1309.  A surveyor reading a map with a magnifying glass, for instance, might also lose her bearings by repeatedly minimizing or magnifying the background image to view different areas.

In any event, although the Image Patents offer a solution to this problem -- moving the portable device itself rather than moving the image by scrolling on the screen of the device -- they do little more than recite that idea and suggest how elements in a generic computer might be harnessed to accomplish the solution.  Even assuming the idea embodied by the invention would improve computer functionality, the Image Patents must still disclose a particularized method to accomplish it.  They provide no such particularity.[3]

---

[3] Indeed, one asserted benefit of the claimed invention is its compatibility with virtually any portable electronic device, "such as cell phones, smart phones, iPads, Kindles, Blackberries, Navigation devices (Magellan or Garmin) and Android systems."

In opposing this motion, Gabara principally argues that
Facebook oversimplifies the Image Patents.  He asserts that when
considered with the specification, which is lengthy, Claim 1 of
the '400 Patent is patent-eligible.  Relying on Core Wireless,
he maintains that the purported invention "recite[s] a specific
improvement over prior systems, resulting in an improved user
interface for electronic devices."  880 F.3d at 1363.  But,
Claim 1 does not recite a specific improvement.  As explained
above, patentable material must not only disclose a desirable
outcome; it must also explain how to realize that outcome.
Claim 1 of the '400 Patent is directed towards the result --
moving a portable device to view portions of a background image.
It does not set forth with any specificity a process to achieve
it beyond applying generic computer processes in some vaguely
defined way.

Gabara also disputes that Claim 1 of the '400 Patent is
representative of all the claims in the Image Patents.  "Courts
may treat a claim as representative in certain situations, such
as if the patentee does not present any meaningful argument for
the distinctive significance of any claim limitations not found
in the representative claim."  Berkheimer v. HP Inc., 881 F.3d
1360, 1365 (2d Cir. 2018).  Gabara offers no meaningful argument
in opposition to Facebook's assertion that Claim 1 of the '400

16

Patent is representative.  Insofar as he disputes this at all,
he does so in a lengthy appendix to his memorandum in opposition
to this motion.  That appendix far exceeds the page limits for
his memorandum and could properly be ignored.[4]  In any event, the
Court has examined the entirety of the four Image Patents.  The
other claims in the Image Patents are substantially similar to
Claim 1 of the '400 Patent, with only semantic differences.
None of those differences are material to the § 101 analysis
undertaken in either the first or second step.

     Turning to step two of the _Alice_ framework, for many of the
reasons that the inventions lack the specificity required to
convert their idea into patentable subject matter, they also
fail to contain an inventive concept.  Simply put, the Image
Patents are insufficiently inventive.  They purport to employ
conventional computer hardware and processes, in an ordinary
manner, to achieve the idea at the heart of the invention.

     The SAC bluntly admits as much.  It states, "the Image
Patents take advantage of existing hardware that is commonplace
in mobile devices . . . without the need for specialized
equipment . . . user training, or . . . restrict[ions] to
certain settings."  Nor do the other descriptions in the SAC or

_____

[4] Gabara explains that he engaged an attorney "for a limited time
period" to help prepare his opposition to the defendant's
motion, but that he is appearing _pro se_.

the Image Patents add in any material way to this description of
the patents.  The SAC asserts that the inventive concept is to
"allow a wide variety of portable devices to reveal parts of
images stored on the device by movement along a vector in one or
more dimensions."  Or as expressed in another portion of the
SAC, the Image Patents' "improvements include the ability to
dynamically adjust the viewing angle and depth of the image
shown when the portable device is moved," resulting in "an
inventive way to view and experience visual content that was not
available in the prior art."

Gabara is correct that conventional components, arranged in
a novel or unconventional fashion, can be inventive.  The Image
Patents, however, contain no such non-generic arrangement.  The
'400 Patent, for example, essentially reports that a generic
computer would gather data and perform the necessary
calculations.  In order to qualify as an inventive concept, the
Image Patents must do more than recite an abstract idea and its
conventional application on a computer.  Because they do not do
so, they do not address patentable subject matter under § 101.[5]

_____

[5] Gabara argues that the Image Patents would not preempt future
inventions that achieve the same result in different ways.
Facebook does not raise preemption as a ground for dismissal.
In any event, the absence of complete preemption does not render
the Image Patents any less abstract.  See Return Mail, Inc. v.
United States Postal Serv., 868 F.3d 1350, 1370 (Fed. Cir.
2017), rev'd on other grounds, 587 U.S. --- (2019).

II.   The '348 Patent

The core features of the '348 Patent are identifying topics in a conversation, searching the internet for those topics, and generating "recall topics" from the search results.  Those features embody the abstract ideas of collecting, analyzing, storing, and retrieving data.  These tasks predated computers.  It is the same process, as Facebook points out, as a student recording a professor's lecture in her notes, researching topics contained in those notes, and using the results of that research to inform questions for and interactions with the professor at the next lecture.

The '348 Patent's purported invention is to apply the functionality of a computer to these tasks.  As described in the patent, a computer uses conventional components such as memory, electronic circuits, and a generic search engine to execute the purported invention.  Put differently, the '348 Patent "[s]tat[es] an abstract idea while adding the words 'apply it with a computer.'"[6]  Alice, 573 U.S. at 223.  As Alice explained,

_____

[6] Gabara relies in part on the statement of the patent examiner who reviewed the '348 Patent.  That examiner stated that all claims of the '348 Patent "are directed to processing a conversation, which is not an abstract idea."  Although the prosecution history of the patent is relevant to determining whether its subject matter is abstract, the § 101 determination must be based on an analysis of the patent claims.  Berkheimer, 881 F.3d at 1369.  Insofar as the patent examiner characterized the '348 Patent as directed towards extracting and processing information, that is an abstract idea.  See, e.g., Content

19

"the mere recitation of a generic computer cannot transform a
patent-ineligible abstract idea into a patent-eligible
invention."  Id.

Notably, the '348 Patent does not describe any improvement
in computer technology or functionality achieved through the
patent.  Nor does the '348 Patent identify any deficiency in the
prior art to which it is directed.

In the SAC, Gabara does claim a purported improvement in
computer functionality.  The SAC alleges that the '348 Patent
"improves on the existing functions of computers by allowing for
a dynamic, responsive system that actively contributes new
information and topics of interest to users during an ongoing
conversation."  Even if it were appropriate to consider this
explanation, which is not found in the '348 Patent, the patent
does not specify how this improvement will be achieved.  And, of
course, in determining whether a patent describes an
improvement, a court "must analyze the asserted claims and
determine whether they capture the[] improvements."  Berkheimer,
881 F.3d at 1369.

The claims in the '348 Patent resemble those deemed
abstract in Intellectual Ventures I LLC v. Capital One Fin.

---

Extraction & Transmission LLC v. Wells Fargo Bank, 776 F.3d
1343, 1349 (Fed. Cir. 2014).

Corp., 850 F.3d 1332 (Fed. Cir. 2017).  That claimed invention
was directed towards "organizing, displaying, and manipulating
data of particular documents" and then presenting the underlying
data.  Id. at 1341 (citation omitted).  That patent, which was
limited to a specialized computer language (XML documents), also
recited generic computer components and was too abstract to
achieve patent protection.  Id. at 1341-42.  For the same
reasons, the '348 Patent fails the step one analysis under §
101.

Gabara asserts that the '348 Patent is analogous to the
patent at issue in Data Engine Techs. LLC v. Google LLC, 906
F.3d 999 (Fed. Cir. 2018).  There, the Federal Circuit held
patent eligible claims reciting "a specific method for
navigating through three-dimensional electronic spreadsheets."
Id. at 1008.  The claimed invention "improv[ed] computers'
functionality as a tool able to instantly access all parts of
complex three-dimensional electronic spreadsheets."  Id.  Unlike
the claims in the '348 Patent, however, the claims at issue in
Data Engine "require[d] a specific interface and implementation
for navigating complex three-dimensional spreadsheets using
techniques unique to computers."  Id. at 1009.  The '348 Patent
teaches no such specific interface or implementation.

It bears emphasis that the '348 Patent is vague.  The specification describes a mobile device as one potential embodiment.  But the invention is also compatible with "a portable system consisting of components that are magnetically and electronically coupled together," and "an apparatus that allows the user to interact with an electronic system."  Such breadth of application further signals an abstract idea.

Proceeding to <u>Alice</u> step two, the '348 Patent lacks an inventive concept that could render it patent eligible.  As explained above, the '348 Patent recites the abstract idea of extracting and processing information from a conversation and raising apposite prompts.  Plainly, the abstract idea itself is not inventive; retrieving relevant information on the basis of prior topics is an ancient practice of human communication.

Accordingly, were there a novel concept in the '348 Patent, it would have to arise in the automation of that process.  But the '348 Patent fails at <u>Alice</u> step two for many of the reasons it was deemed abstract at step one.  The computer components recited in the '348 Patent are generic, not innovative: a "finite state machine," "memory," and a "circuit."  Those existed long before the invention claimed here.  Furthermore, as the '348 Patent specification acknowledges, the process of enlisting a search engine to search the internet existed prior

22

to the patent's filing.  See '348 Patent at 16:46-50 ("These topics are sent wirelessly to the network by RF Link and the network routes the topic list to WWW which is the World Wide Web, also known as the Internet, to search engines that perform searches on the recalled topics.").  Similarly, the specification recites that common computer components such as an "Audio Signal Analyzer Block," "Determination Circuit Block," or "Voice Recognition Block" could be involved in extracting search terms from the conversation.  But, the patent does not describe a way to arrange the components it lists in any novel or non-conventional fashion.  In essence, the '348 Patent lists components from a generic computer that would be useful to carry out the desired task.  It does not actually describe how the purported invention works.

Nor does the '348 Patent solve a problem unique to computer-based conversation.  See Uniloc USA, Inc. v. LG Elecs. USA, Inc., 957 F.3d 1303, 1308 (Fed. Cir. 2020).  In the SAC, Gabara asserts that the '348 Patent is an advance over the prior art because it "proactively" aids in continuing or improving a conversation.  The problems that Gabara identifies as the target of the invention -- interruptions, disruptive speakers, or silences in conversations -- are commonplace, whether the conversation occurs on a computer or not.

23

Similarly, the solution presented in the '348 Patent --
generating new topics by linking them to what has been discussed
-- is conventional.  And the '348 Patent does not identify any
particular aspect of digital communication that exacerbates
those issues.  For example, any conversation may falter and run
out of topics.  The '348 Patent describes one way of remedying
that lapse -- searching the internet for new subjects.  But, it
does not recite a novel method to perform that function.
Instead, it enlists generic computer components to assist in the
generation of a new topic.[7]

Gabara principally argues that Facebook has misrepresented
the '348 Patent to strip it of its inventive features.  Relying
on Bascom, Gabara maintains that "an inventive concept can be
found in the non-conventional and non-generic arrangement of
known, conventional pieces."  827 F.3d at 1341.  But neither the
'348 Patent nor the SAC identifies how the purported invention
is non-conventional or non-generic.  In Bascom, the Federal
Circuit upheld patent claims directed towards filtering content
from the internet because they did not "merely recite the

---

[7] Gabara's opposition to this motion asserts that the '348 Patent
improves computer function by recalling the most recent topics
as prompts for the interlocutors.  This improvement does not
appear in the '348 Patent itself or even in the SAC.
Accordingly, it cannot provide the basis for determining that
the patent embodies an inventive concept.  See Berkheimer, 881
F.3d at 1369.

abstract idea of filtering content along with the requirement to perform it on the Internet, or to perform it on a set of generic computer components." Id. at 1350.  Instead, the Bascom patent described the prior-art filtering technology and recited a discrete improvement to that technology.  Id.  There, the patent leveraged the ability to associate the request for online content with a specific user to create bespoke filtering of internet content.  Id.  The claims therefore "recite[d] a specific, discrete implementation of the abstract idea of filtering content."  Id.

The '348 Patent, by contrast, is silent about the prior art or how it improves upon it.  And as already explained, it lacks specificity in application that could render it more than the recitation of an abstract idea.  The expansive and generic terms of the patent here are insufficient to spell out a concrete advance in technology and are not patentable under § 101.

## Conclusion

Facebook's March 6 motion to dismiss the SAC is granted. The Clerk of Court shall enter judgment for the defendant and

25

close the case.

Dated:     New York, New York
           September 4, 2020

                                        _____
                                              DENISE COTE
                                        United States District Judge